UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| MYRA MYRICK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 3:16-cv-690 |
| | ) | Judge Aleta A. Trauger |
| | ) | |
| PUBLIX SUPER MARKETS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

The defendant, Publix Super Markets, Inc. ("Publix"), has filed a Motion for Summary Judgment (Docket No. 25), to which the plaintiff has filed a Response in Opposition (Docket No. 41), and Publix has filed a Reply (Docket No. 48). For the following reasons, the motion will be granted.

## BACKGROUND[1]

The plaintiff, Myra Myrick, was employed by the defendant, Publix, in various capacities for eight years. By all accounts, Ms. Myrick's work at Publix exceeded expectations and garnered her good performance reviews. Moreover, according to Ms. Myrick, she was happy at Publix and "truly enjoyed [her] job . . . [r]ight up until the last day [she] worked." (Docket No.

---

[1] Unless otherwise noted, the facts recounted in this section are drawn primarily from Publix's Statement of Undisputed Material Facts (Docket No. 27), the plaintiff's response thereto (Docket No. 40), the plaintiff's Statement of Undisputed Facts (Docket No. 41-1), and Publix's response thereto (Docket No. 47). This section also contains facts from Publix's Motion for Summary Judgment and Amended Memorandum of Law in support thereof (Docket Nos. 25, 29), the plaintiff's Response in Opposition (Docket No. 41), and Publix's Reply (Docket No. 48) that are not refuted or contradicted by the opposing party or the record. Where there is a genuine dispute of fact, the court will construe the fact in the light most favorable to the plaintiff as the non-moving party.

1

46-1 (Depo. M. Myrick), 26:14–21, 46:17–18.)  Nevertheless, Ms. Myrick tendered her resignation to Publix on August 11, 2015, allegedly because she had been subjected by her manager to harassment on the basis of her religion and "forced . . . to work in a hostile environment that no reasonable person would tolerate."  (Docket No. 1 ¶¶ 16–18.)  In the pending action, Ms. Myrick alleges that Publix created and permitted the existence of a hostile work environment, which resulted in her constructive discharge, in violation of Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e-2 *et seq.*  (*Id.* ¶ 3, p. 5.)

Ms. Myrick was initially hired by Publix in March of 2007 and, in her first four years of employment with the company, held a variety of positions, including cashier, price scan clerk, and customer service staff.  In 2011, Ms. Myrick was transferred to a Publix store in Gallatin, Tennessee to work as a direct store delivery ("DSD") Inventory Clerk.  As a DSD Inventory Clerk, Ms. Myrick was primarily responsible for receiving and verifying the quantity of product delivered by suppliers to, or credited out from, the store.  Her typical duties included tasks such as scanning product when it arrived at the store, ensuring that counts of incoming and outgoing product were accurate, and ensuring that the area where deliveries were made remained clean and organized.  The job description for DSD Inventory Clerk does not list any minimum physical requirements for the position, but its day-to-day duties do appear to require some light lifting.

**I.      Ms. Myrick Is Allegedly Subjected to Harassment on the Basis of Her Religion.**

Ms. Myrick alleges that she was subjected to harassment on the basis of her religion by her manager, Robb Steiner, who became Grocery Manager at the Publix store in Gallatin, Tennessee in April of 2013.  It appears that Ms. Myrick had no issues with Mr. Steiner until after November of 2014, when Mr. Steiner attended a faith-based retreat – called an "Encounter Training" – in Brentwood, Tennessee.  After Mr. Steiner attended this retreat, Ms. Myrick

2

alleges that he began to talk about the Encounter Training and religion "constantly while he was at work." (Docket No. 41, pp. 8–9 (citing Docket No. 41-2 (Decl. M. Myrick) ¶ 3).)[2] Ms. Myrick acknowledges that Mr. Steiner never said anything to her that was "threatening" (Docket No. 46-1, 177:22–178:4), but she claims to have been intimidated by Mr. Steiner's conduct to the point that she felt that she "could not refuse to attend his religious seminar," (Docket No. 41, pp. 8–9 (citing Docket No. 46-1, 163:2–17)). Additionally, Ms. Myrick alleges that she felt that Mr. Steiner "belittled" her religion because he asked her, "Why do you drive all the way to Murfreesboro to go to church?" (Docket No. 46-1, 178:5–10.)

As Ms. Myrick herself admits, however, she typically had "very little interaction" with Mr. Steiner in 2015. (*Id.* at 83:5–24 ("Q: In the 2015 time frame, in a given week of your workweek, . . . how many hours or minutes a week would you spend actually interacting with your direct supervisor? . . . A: Very little.").) Moreover, Ms. Myrick was asked to identify "everything that Robb Steiner did or said that [she] fe[lt] created a hostile work environment based on religion" in her deposition (*id.* at 153:23–25), and she identified the following

---

[2] Publix argues that Ms. Myrick's only support for this statement is her "sham declaration," which must be disregarded by the court in ruling on the pending motion. (Docket No. 48, p. 5 (citing Docket No. 41-2 ¶¶ 2–3).) Noting that Ms. Myrick identified only six incidents of purported harassment by Mr. Steiner in her deposition, Publix argues that she now "tries to change her story to say that . . . [Mr.] Steiner 'constantly' and 'frequently' harassed her by discussing the Encounter Training at work." (*Id.*) Though Publix is correct in arguing that the court may disregard a declaration submitted at summary judgment that contradicts the declarant's prior sworn testimony, *see France v. Lucas*, 836 F.3d 612, 622 (6th Cir. 2016), the court may not ignore the challenged statement in Ms. Myrick's declaration, because it does not directly contradict her deposition testimony. While the court understands – and, to some extent, shares – Publix's concern that the declaration was created and submitted solely to create disputes of fact sufficient to survive summary judgment, Ms. Myrick's deposition testimony does include an isolated statement that Mr. Steiner began to "talk[] about religious stuff continuously" after attending the Encounter Training in November of 2014 (Docket No. 46-1, 92:1–3). The court lacks any grounds, therefore, for excluding this portion of her declaration.

3

incidents:

1. In January or February of 2015, Mr. Steiner shared with Ms. Myrick how he felt his life had changed after attending the Encounter Training. (*Id.* at 153:12–22.)

2. In mid-January of 2015, Mr. Steiner "strongly encourage[d]" Ms. Myrick to attend the Encounter Training and told her that he could have the enrollment fee waived for her. (*Id.* at 154:1–11, 158:4–14.)

3. In January or February of 2015, Mr. Steiner informed Ms. Myrick that one of their co-workers would be attending the Encounter Training and suggested that Ms. Myrick also attend. He also talked about the training "like it was just the end all and be all." Ms. Myrick declined the invitation. (*Id.* at 154:12–21, 159:2–20.)

4. In July of 2015, Mr. Steiner strongly encouraged Ms. Myrick to attend the Encounter Training, because "it would help [her] better deal with people in [her] everyday life and at work." He then encouraged Ms. Myrick to speak to a co-worker who had attended the training about "how much it's . . . enlightened her." (*Id.* at 155:3–11; 156:7–11, 159:21–160:7.)

5. In late July of 2015, Mr. Steiner gave Ms. Myrick a business card for the Encounter Training, once in person and once by leaving the card on her desk. The business cards contained the date of the next training and a website address. At a gathering of Publix employees on July 24, 2015, Mr. Steiner told Ms. Myrick and others that the Encounter Training "was a real eye-opener on how to deal with people in his everyday life." (*Id.* at 155:20–25, 156:23–157:7, 161:13–162:2.)

6. On August 8, 2015, Mr. Steiner walked the length of several aisles of the store with Ms. Myrick while she worked, asking her whether she attended a church and encouraging her to attend his church. According to Ms. Myrick, Mr. Steiner told her that she "needed to get [her] heart right with God" and asked if she knew "where [she's] going to go when [she] die[s]." After two or three minutes of this "religious lecture," Ms. Myrick told Mr. Steiner to "get the hell away" from her. Mr. Steiner laughed in response and then "left [her] alone." (*Id.* at 160:8–161:12; Docket No. 47 ¶¶ 63–64.)

After Ms. Myrick described these six incidents in her deposition, she confirmed that she had recounted "each and every instance of anyone at Publix creating a hostile work environment." (Docket No. 46-1, 162:3–7.)

4

## II. Mr. Steiner's Conduct Allegedly Interferes with Ms. Myrick's Work and Leads to Her Resignation.

Ms. Myrick contends that Mr. Steiner's "harassment" unreasonably interfered with her work performance, because "[e]very time Mr. Steiner tried to persuade [her] to attend the Encounter Training and she did not attend, [he] would pressure her to stock shelves," a task she was not physically capable of performing. (Docket No. 41, pp. 3, 9.) For many years, Ms. Myrick has experienced occasional pain in her back and persistent swelling, pain, and discomfort in her knees, which prevent her from squatting or kneeling.[3] (Docket No. 46-1, 16:3–17:23, 38:15–25, 75:18–20.) Ms. Myrick's back and knee problems do not appear to have interfered with her performance of the duties normally assigned to her as DSD Inventory Clerk, but she contends that they prevented her from stocking the store's shelves, ostensibly because placing product on a shelf near the floor would require her to squat or kneel. (*Id.* at 167:9–22.)

Ms. Myrick has identified two incidents in which Mr. Steiner requested that she stock shelves shortly after she declined an invitation to attend the Encounter Training. The first of these requests occurred during her semi-annual performance evaluation in March of 2015, approximately one month after she first declined to attend an Encounter Training. (Docket No. 41, p. 3.) At this meeting, Ms. Myrick was informed that, based on Publix's use of a staffing software program that was meant to assist managers in creating more effective work schedules, the company had determined that the primary duties of the DSD Inventory Clerk should take

---

[3] In the pending motion, Publix appears to question whether Ms. Myrick's back and knee issues are truly as limiting as she alleges they are, because she has never received medical treatment or requested an accommodation for them, and she "admits that she has no problem reaching down to the lowest shelf, reaching down to the floor level to pick up pallets, [or] stacking pallets." (*See* Docket No. 29, p. 16 (citing Docket No. 46-1, 51:1–6, 72:10–20).) Ms. Myrick has explained, however, that she was able to perform duties that require lifting or being able to reach places that were close to the ground by bending at the waist, rather than by bending at the knee or squatting. (*See* Docket No. 41-2 ¶ 4; Docket No. 46-1, 73:16–25.)

5

only 28 hours per workweek to accomplish. (Docket No. 40 ¶¶ 5–6; Docket No. 46-1, 85:10–24.) Mr. Steiner further informed Ms. Myrick that all DSD Inventory Clerks would be assigned other tasks to fill the remaining 12 hours of their workweek and requested that she stock shelves in her extra time. (Docket No. 46-1, 85:10–24.) According to Ms. Myrick, she informed Mr. Steiner that she was physically incapable of stocking shelves and, together, they agreed that she would instead take on responsibilities such as cleaning, placing special requests from customers, and changing the tags on merchandise throughout the store. (Docket No. 41-2 ¶ 4.) The second request occurred on August 11, 2015, three days after Mr. Steiner's "religious lecture" in the aisles of the store. On that day, Mr. Steiner and the Store Manager, Tim Newhouse, arranged a meeting with Ms. Myrick to discuss her duties and request that she stock shelves as a part of new duties that were being assigned to her. According to Ms. Myrick, she informed both Mr. Steiner and Mr. Newhouse that she was not physically capable of stocking shelves, a position that she maintained even after Mr. Newhouse requested that she "at least try" to perform the task. (Docket No. 46-1, 165:10–166:4.)

During the meeting, Ms. Myrick informed the two men that she intended to resign from her employment with Publix. Despite protestations from Mr. Newhouse – who asked if she was "sure this is what [she] want[ed] to do" and said he "really hate[d] to lose [her]" (*id.* at 115:1–12) – Ms. Myrick submitted her written resignation the same day, with an effective date of August 31, 2015 (Docket No. 25-1 (Ex. 12), p. 84). According to Ms. Myrick, she felt that it had been "made very clear that [her] job depended on [her] stocking shelves" and that she had "no other choice" but to resign. (Docket No. 46-1, 168:18–25.) By Ms. Myrick's own admission, however, it was her idea to resign, and no one at Publix "ever said anything encouraging [her] to quit" or told her that she would be fired for refusing to stock shelves if she did not resign first.

6

(*Id.* at 112:7–9, 167:23–168:12.) Moreover, Ms. Myrick admits that she never requested a transfer to a different position or a different store. (Docket No. 40 ¶ 39.)

Nor does it appear that Ms. Myrick reported Mr. Steiner's alleged harassment until after she had already submitted her resignation. Publix maintains a number of mechanisms through which employees can report harassment, with information about these available in the employee handbook and on notices posted in employee break rooms. Employees are instructed to raise any concerns with their Store Manager, District Manager, or Associate Relations Specialist, and they are also given the option of calling an employee hotline or filing a formal complaint with Publix's Manager of Equal Employment Opportunity. Ms. Myrick admits that she never called the employee hotline, filed a formal complaint, or reported Mr. Steiner to Mr. Newhouse or her District Manager. (*Id.* ¶¶ 34–37.) Ms. Myrick did attempt to contact Publix's Associate Relations Specialist, Lisa Hudson, by phone on three separate occasions after she had tendered her resignation,[4] but she never spoke with Ms. Hudson about the alleged harassment or her

---

[4] In the declaration that she has submitted in support of her Response, Ms. Myrick claims for the first time that she initially called Ms. Hudson on August 8, 2015, three days before she tendered her resignation. (Docket No. 41-2 ¶ 9.) This statement, however, contradicts (1) her deposition testimony, in which she testified to having made three phone calls to Ms. Hudson between August 14 and August 27, 2015; and (2) her Response to Publix's Statement of Undisputed Facts, in which she admits that it is "undisputed" that she "called Human Resources for the *first time on August 14, 2015*." (Docket No. 40 ¶ 40.) Moreover, Ms. Myrick claims that her "realiz[ation]" that she called Ms. Hudson on August 8, 2015 is based on a timeline that was used as an exhibit in her deposition but which she has failed to place into the record on summary judgment. (Docket No. 41-2 ¶ 9.) As the Sixth Circuit has noted, if an affidavit submitted at summary judgment contradicts the affiant's prior sworn testimony, "it should be stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction." *France*, 836 F.3d at 622 (quoting *Aerel, S.R.L v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006)). Ms. Myrick's representation that she attempted to contact Ms. Hudson on August 8, 2015 directly contradicts her prior deposition testimony and current briefing, and Ms. Myrick has offered no persuasive justification for those contradictions. The court, therefore, will exclude any reference to the alleged August 8 call from its consideration of the pending motion.

resignation.

## **PROCEDURAL HISTORY**

On March 26, 2017, Publix filed the pending motion (Docket No. 25), accompanied by an Amended Memorandum of Law (Docket No. 29),[5] a Statement of Undisputed Material Facts (Docket No. 27), and various declarations and excerpted deposition testimony (Docket Nos. 25 & 26). In the Amended Memorandum, Publix argues that summary judgment is appropriate because Ms. Myrick's Title VII claims are unsupported by the undisputed facts. (Docket No. 29, p. 1.) First, Publix argues that Ms. Myrick has not established a *prima facie* claim for hostile work environment, because she (1) alleges "nothing more than a few isolated incidents of religious inquiries" from Mr. Steiner, which do not constitute an objectively hostile work environment (*id.* at pp. 6–9); (2) has no evidence establishing that the alleged harassment was rooted in a discriminatory motive (*id.* at pp. 9–10); and (3) cannot demonstrate that she made Publix aware of the alleged harassment until after she had resigned (*id.* at pp. 10–13). Second, Publix argues that Ms. Myrick does not have evidence sufficient to support a *prima facie* claim for constructive discharge, because she (1) has failed to prove that the work environment was hostile, let alone that it would be perceived as "intolerable" by a reasonable person (*id.* at pp. 14–15); (2) cannot demonstrate that Publix deliberately made the working conditions intolerable to force her to quit (*id.* at pp. 15–16); and (3) chose to resign not because she was being harassed but, rather, because she did not want to stock shelves (*id.* at p. 16). For these reasons, Publix requests that the court dismiss all claims against it.[6]

---

[5] The Amended Memorandum corrects typographical errors in the Memorandum that was originally filed in support of the pending motion. (Docket No. 29.)

[6] Publix also requests that costs be assessed against Ms. Myrick as appropriate. (Docket No. 29, p. 18.) To the extent that Publix intends to pursue recovery of its costs pursuant to

8

On April 29, 2017, Ms. Myrick filed a Response in Opposition to Publix's motion (Docket No. 41), accompanied by a Response to Publix's Statement of Undisputed Material Facts (Docket No. 40), a Statement of Undisputed Facts (Docket No. 41-1), her own declaration (Docket No. 41-2), and excerpted portions of deposition testimony (Docket No. 42). In her Response, Ms. Myrick argues that she can establish a *prima facie* hostile work environment claim, because the evidence demonstrates that her workplace was "permeated with discriminatory intimidation" that unreasonably interfered with her work performance. (Docket No. 41, pp. 7–10.) Moreover, Ms. Myrick argues, Publix is liable for Mr. Steiner's harassment because Mr. Steiner was an agent of Publix, and because Publix had constructive notice that the harassment was taking place but failed to take prompt corrective action. (*Id.*) Ms. Myrick further argues that she has established a *prima facie* constructive discharge claim, because a reasonable person would have perceived being "presented with the option of risking her health or her job" as an intolerable working condition, and because circumstantial evidence demonstrates that Mr. Steiner required her to stock shelves only after she refused to attend the Encounter Training. (*Id.* at pp. 11–12.)

On May 12, 2017, Publix filed a Reply in support of the pending motion (Docket No. 48), accompanied by a Response to the plaintiff's Statement of Undisputed Facts (Docket No. 47) and a chart that compares statements from Ms. Myrick's deposition with purportedly contradictory statements made in her declaration (Docket No. 48-1). Publix argues that Ms. Myrick has submitted a "sham declaration" that purports to change her prior sworn testimony in order to manufacture questions of fact and avoid summary judgment, and the declaration, therefore, must be disregarded by the court in ruling on the pending motion.

---

Federal Rule of Civil Procedure 54(d), it should comply with the procedures set out in Local Rule 54.01(a).

(Docket No. 48, pp. 3–7.) Moreover, Publix argues, even if the court were to consider the statements in the declaration, Ms. Myrick's claims must still be dismissed, because the allegedly harassing conduct she has complained of was not sufficiently severe or pervasive to constitute a hostile work environment, nor was it so intolerable that an objectively reasonable person would feel that they had no choice but to quit. (*Id.* at pp. 7–19.)

## **LEGAL STANDARD**

Federal Rule of Civil Procedure 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

**ANALYSIS**

Ms. Myrick alleges that Publix discriminated against her in violation of Title VII by "creat[ing] and permit[ing] to exist a hostile work environment related to religion," which "led to her constructive discharge in August 2015." (Docket No. 1, p. 5.) Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). For claims brought pursuant to this provision of Title VII, courts apply the burden-shifting framework developed by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), to determine whether the plaintiff has proffered sufficient evidence to survive summary judgment. *See Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775–76 (6th Cir. 2016).[7] Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *Id.* at 776. Once the plaintiff establishes a *prima facie* case, "the burden shifts to the defendant to offer evidence of some legitimate, non-discriminatory reason" for taking the challenged action. *Id.* If the defendant meets this burden, "the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but merely a pretext for discrimination." *Id.*

**I.     Hostile Work Environment Claim**

The Supreme Court has held that a plaintiff may establish a Title VII violation by proving that discrimination based on religion created a hostile or abusive work environment. *Meritor*

---

[7] The *McDonnell Douglas* framework does not apply in cases where the plaintiff has offered direct evidence of discrimination, *In re Rodriguez*, 487 F.3d 1001, 1007 (6th Cir. 2007), but Ms. Myrick has not presented direct evidence of discrimination; nor has she argued that the *McDonnell Douglas* framework is inapplicable to her claims.

11

*Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986). To establish a *prima facie* claim of hostile work environment, a plaintiff must demonstrate the following: "(1) she was a member of a protected class; (2) she was subjected to unwelcomed harassment; (3) the harassment was based on [her protected status]; (4) the harassment created a hostile work environment; and (5) employer liability." *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 500 (6th Cir. 2009); *accord Bourini v. Bridgestone/Firestone N. Am. Tire, LLC*, 136 F. App'x 747, 750 (6th Cir. 2005). Where, as here, the plaintiff alleges that she was discriminated against because she did not hold the same religious beliefs as her supervisor, and not because of her own religious practices or beliefs, "the use of the protected class factor is inappropriate." *Nichols v. Snow*, No. 3:03-cv-0341, 2006 WL 167708, at *11–12 (M.D. Tenn. Jan. 23, 2006) (adopting approach used by the Tenth Circuit in *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1038 (10th Cir. 1993)). In such a case, the plaintiff is required to set forth "some additional evidence to support the inference that the employment actions were taken because of a discriminatory motive based upon [her] failure to hold or follow [her] employer's religious beliefs." *Id.* (quoting *Shapolia*, 992 F.2d at 1038); *accord Willis v. Integrity Realty Grp., LLC*, No. 1:10-cv-1094; 2011 WL 3471555, at *5 (N.D. Ohio Aug. 9, 2011).

Publix argues that Ms. Myrick has failed to establish a *prima facie* claim of hostile work environment because she has failed to demonstrate that (1) Mr. Steiner's alleged harassment created an objectively hostile work environment, (2) the harassing behavior was the result of a discriminatory motive, or (3) Publix had any meaningful notice that Ms. Myrick felt harassed by Mr. Steiner. (Docket No. 29, pp. 6–13.) Ms. Myrick, on the other hand, argues that the evidence clearly demonstrates that (1) Mr. Steiner's harassing conduct was sufficiently frequent and severe to create an objectively hostile work environment, (2) his demands that she stock shelves

12

were so close in time to her refusal to attend the Encounter Training that they give rise to the reasonable inference of discriminatory intent, and (3) Publix is liable for Mr. Steiner's conduct because Mr. Steiner was an agent of Publix, or – in the alternative – Publix had constructive notice of Mr. Steiner's harassing behavior through Mr. Newhouse. (Docket No. 41, pp. 7–11.)

Upon its review of the record, the court concludes that Ms. Myrick has failed to demonstrate a *prima facie* claim for hostile work environment, because she has failed to demonstrate that an objectively reasonable person would find that Mr. Steiner's conduct created an abusive working environment, however offensive and inappropriate the court considers that conduct to be. Under well-established Supreme Court precedent, a hostile work environment occurs only "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Determining whether an environment is hostile or abusive requires "looking at all the circumstances" and considering factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or, a mere offensive utterance; and whether it unreasonably interferes with an employees' work performance." *Id.* at 23. Moreover, the conduct must be so severe or pervasive that an objectively reasonable person would find it abusive in addition to the plaintiff subjectively perceiving it as such. *Id.* at 21; *see also Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 600 (6th Cir. 2007) (noting that the federal courts are "generally not in the business of refereeing . . . common workplace conflicts").

Upon consideration of the frequency, severity, and nature of Mr. Steiner's allegedly harassing conduct, the court concludes that no objectively reasonable person could find that his behavior was sufficiently severe and pervasive to create an abusive working environment. First,

13

Ms. Myrick has failed to demonstrate that her workplace was "permeated" with discriminatory intimidation, ridicule, and insult, because the evidence demonstrates nothing more than a handful of isolated religious inquiries and invitations made by Mr. Steiner between January and August of 2015. In response to a request to identify "everything that Robb Steiner did or said that [she] fe[lt] created a hostile work environment based on religion" in her deposition, Ms. Myrick was able to recall only six incidents in eight months in which she felt harassed by Mr. Steiner. (Docket No. 46-1, 153:6–15.) Moreover, even though Ms. Myrick has stated that, in addition to these specific incidents, Mr. Steiner "discussed the [Encounter] [T]raining or religion constantly while he was at work" (Docket No. 41, p. 8 (citing Docket No. 41-2 ¶ 4)), this general allegation is belied by her admission that she interacted with Mr. Steiner "[v]ery little" on a weekly basis in 2015 (Docket No. 46-1, 83:5–10). Ms. Myrick, therefore, has failed to demonstrate that Mr. Steiner's alleged harassment was pervasive.

Second, Ms. Myrick has failed to demonstrate that any of Mr. Steiner's conduct was sufficiently severe to create a hostile or abusive working environment. Ms. Myrick claims that she found Mr. Steiner's conduct to be "intimidating" and "belittling,"[8] but her subjective feelings are not sufficient – on their own – to establish the existence of a hostile work environment. *See Harris*, 510 U.S. at 21. Ms. Myrick must also demonstrate that a reasonable person would find Mr. Steiner's conduct to be abusive, *id.*, and nothing in the incidents recounted by Ms. Myrick could be reasonably understood to be insulting, threatening, or intimidating. Ms. Myrick may have felt "belittled" when she was asked why she drives to another city to go to church (Docket No. 46-1, 178:5–10), but the court cannot conclude that an objectively reasonable person would

---

[8] It is not clear from the record that Ms. Myrick subjectively believed her work environment to be hostile or abusive, given that she has testified that she "truly enjoyed [her] job . . . [r]ight up until the last day [she] worked." (Docket No. 46-1, 26:14–21, 46:17–18.).

feel the same way. Moreover, as recounted by Ms. Myrick, most of Mr. Steiner's allegedly harassing conduct is reasonably characterized as endorsements for the Encounter Training, which he "strongly encourage[d]" Ms. Myrick to attend because it would "help [her] better deal with people." (*Id.* at 154:1–11, 158:4–14, 155:3–156:11; 159:21–160:7.) While a reasonable person might find Mr. Steiner's repeated attempts to engage in a discussion of the Encounter Training or his church annoying or even mildly offensive, Title VII does not guarantee "a utopian workplace or even a pleasant one." *Michael*, 496 F.3d at 600 (quoting *Vore v. Ind. Bell Tel. Co.*, 32 F.3d 1161, 1162 (7th Cir. 1994)). Ms. Myrick is entitled to be free from abuse and hostility in her workplace, but Title VII does not guarantee that she will never be exposed to an invitation to someone else's church or a discussion about religion.

Even the incident that is arguably the most egregious example of Mr. Steiner's behavior could not reasonably be considered severe enough to create an abusive working environment. Ms. Myrick has presented evidence that Mr. Steiner followed her down the aisles of Publix as he tried to convince her to attend his church and "get [her] heart right with God" (*id.* at 160:8–22), but she admits that this incident lasted a mere two to three minutes and that, when she told Mr. Steiner to "get the hell away" from her, he dropped his religious lecture and left her alone (Docket No. 47 ¶ 63 (quoting Docket No. 46-1, 161:7)). Moreover, as the defendants correctly note, courts routinely find language and behavior far more egregious than the totality of the conduct described by Ms. Myrick insufficient to support a finding that the plaintiff was subjected to a hostile work environment. *See, e.g.*, *Wade v. Automation Pers. Servs., Inc.*, 612 F. App'x 291, 299 (6th Cir. 2015) (finding that a supervisor's targeting of a religious employee by talking about drinking in front of her, using sexual language, and shifting her schedule deliberately to interfere with her nightly devotional "does not come close to being objectively hostile"); *Hafford*

*v. Seidner*, 183 F.3d 506, 514 (6th Cir. 1999) (finding that workplace accusations that a Muslim plaintiff was preparing for a "holy war," that he fraternized with inmates over the Muslim religion, and that his religion taught him to hate white people were "insufficient to show a hostile work environment").

Finally, to the extent that Ms. Myrick argues that Mr. Steiner's request that she stock shelves created a hostile work environment, the court notes that she was never actually required to stock shelves, nor was she ever informed that she would be terminated or suffer any other adverse employment action, should she refuse to perform the requested task. To the contrary, when Ms. Myrick refused to stock shelves after being asked to do so in March of 2015, she was permitted by Mr. Steiner to continue in her position as DSD Inventory Clerk with a set of duties that were more amenable to her purported physical limitations. No reasonable person could find that a mere request that Ms. Myrick undertake a certain duty – devoid of any objective threat to her continued employment or imposition of adverse consequences as a result of her refusal – so altered the conditions of her employment as to create an abusive working environment. *See Wade*, 612 F. App'x at 299 (concluding that an employee had not even come close to demonstrating an objectively hostile work place when she submitted evidence that her supervisor changed her schedule in a deliberate attempt to interfere with her nightly devotional).

Ms. Myrick has failed to establish that an objectively reasonable person could find that she suffered harassment that was so severe and pervasive that it created an abusive working environment and, accordingly, she cannot establish a *prima facie* claim for hostile work environment on the basis of religion. Because her claim cannot proceed as a matter of law, the court does not reach the questions of whether Mr. Steiner's conduct was motivated by Ms. Myrick's failure to hold or follow his religious beliefs or whether Publix is liable for

Mr. Steiner's conduct.

## II. Constructive Discharge Claim

Ms. Myrick has also failed to demonstrate that Publix violated Title VII by constructively discharging her. "To demonstrate a claim for constructive discharge, [a plaintiff] must show that (1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, (2) the employer did so with the intention of forcing the employee to quit, and (3) the employee actually quit." *Wade*, 612 Fed. App'x at 300–01 (quoting *Regan v. Faurecia Auto. Seating, Inc.*, 679 F.3d 475, 481 (6th Cir. 2012)); *accord Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999). As stated by the Sixth Circuit, the "intolerable working conditions" can take two different forms: (1) a "discriminatory work environment even more egregious than the high standard for hostile work environment," or (2) an employer acting "in a manner so as to have communicated to a reasonable employee that she will be terminated." *Laster v. City of Kalamazoo*, 746 F.3d 714, 728 (6th Cir. 2014) (quoting *E.E.O.C. v. Univ. of Chicago Hosps.*, 276 F.3d 326, 331–32 (7th Cir. 2002)). Ultimately, a constructive discharge claim "requires a determination that working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Smith v. Henderson*, 376 F.3d 529, 533–34 (6th Cir. 2004) (internal quotations omitted).

Ms. Myrick has failed to demonstrate that Publix deliberately created intolerable working conditions that would be perceived as such by an objectively reasonable person. As discussed above, Ms. Myrick has not submitted evidence sufficient to demonstrate that she was subjected to a working environment so abusive as to violate Title VII, so she cannot prove that her work environment was "even more egregious than the high standard for hostile work environment."

17

*See Laster*, 746 F.3d at 728. Ms. Myrick has also failed to prove that Publix or any of its employees acted in a manner that would communicate to a reasonable employee that she would be terminated, such that the employee would have felt compelled to resign. Ms. Myrick herself has acknowledged that no one at Publix "ever said anything encouraging [her] to quit or resign" or told her that she would be terminated if she did not stock shelves. (Docket No. 46-1, 167:23–168:12.) Moreover, it appears that Mr. Newhouse attempted to dissuade Ms. Myrick from tendering her resignation, asking her if she was sure about her decision and telling her that Publix would "really hate to lose [her]." (Docket No. 46-1, 115:1–12.)

Ms. Myrick argues that she was constructively discharged because, in light of her supervisors' request that she stock shelves in the August 11, 2015 meeting, she felt that she had "no other choice" but to resign because she was presented with the option of risking her health or her job." (*Id.* 168:18–25; Docket No. 41, p. 11.) Ms. Myrick's feeling that she had "no choice," however, is pure speculation on her part, and she has not established that the mere request that she stock shelves created working conditions that were so difficult or unpleasant that a reasonable person would have felt compelled to resign without first pursuing available remedies. *Dendinger v. Ohio*, 207 F. App'x 521, 527 (6th Cir. 2006) (concluding that, to establish a constructive discharge claim, the plaintiff must demonstrate that "her working conditions were so unbearable that she could not have remained on the job while pursuing available remedies"). Ms. Myrick could have simply refused to stock shelves, a refusal that she had made during her meeting with Mr. Steiner in March of 2015 and that had resulted in no adverse employment action. Moreover, Ms. Myrick admits to never having sought treatment from a doctor for her back and knee issues, obtained medical documentation of her physical condition, or sought a reasonable accommodation from Publix (Docket No. 40 ¶¶ 22–24), and she has advanced no

cogent argument regarding why she could not pursue such an accommodation after the August 11, 2015 meeting. After reviewing the circumstances surrounding Ms. Myrick's resignation, and the remedies available to her that she simply did not pursue, the court cannot conclude that a reasonable person would have felt compelled to resign when she did. Ms. Myrick, therefore, cannot demonstrate that she was subjected to intolerable conditions with the intent of forcing her to resign, and she cannot establish a *prima facie* claim for constructive discharge. Accordingly, Ms. Myrick's claim of constructive discharge cannot be allowed to proceed as a matter of law, and the court, therefore, must grant summary judgment to Publix.

## **CONCLUSION**

For the reasons discussed herein, the Motion for Summary Judgment filed by Publix will be granted.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge